

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

ROBERT C. GIENKO, MARK PUGH, )
STEVE FAGERMAN, and KENNETH )
JANOWSKI, )
            )   Case No.
    Plaintiffs, )
            )  **00C 5070**
v. )
            )  **JURY TRIAL DEMANDED**
K. SHAN PADDA, STEVEN L. HOLDEN, )
PAUL S. JUREWICZ, JOHN REILLY, )
WILLIAM D. LAUTMAN, EGS SECURITIES )
CORPORATION, and KPMG LLP, )
            )
    Defendants. )

JUDGE COAR

MAGISTRATE JUDGE BOBRICK

## COMPLAINT

Plaintiffs Robert C. Gienko, Mark Pugh, Steve Fagerman, and Kenneth Janowski,

through their undersigned attorneys, hereby complain against defendants, demanding trial by

jury, as follows:

**DOCKETED**

**AUG 2 1 2000**

I.

## INTRODUCTION

1.     This is an action for damages based on defendants' fraud in connection with

plaintiffs' sale of their business, Strategic Reimbursement Services, Inc. ("SRS"), to Sabratek

Corporation ("Sabratek") in exchange for Sabratek stock on June 29, 1999 (hereinafter the "SRS

Transaction").

2.     Defendants were Sabratek's officers and directors, investment banker, and auditor

and principal accounting firm at all times relevant to the SRS Transaction, and each of the

defendants engaged in a fraudulent scheme to induce plaintiffs to sell SRS to Sabratek in

exchange for Sabratek stock, rather than cash.

14107035.5

3.       Plaintiffs' allegations are based on their actual communications with defendants both before and after the SRS Transaction and their review and analysis of Sabratek's reported financial statements, upon which they justifiably relied. As set forth with particularity herein, defendants' fraudulent scheme included making material misstatements about Sabratek to plaintiffs, including misstatements about Sabratek's financial condition, and failing to disclose to plaintiffs material information about Sabratek that would have been important to plaintiffs' decision to sell.

4.       At the time of the sale, Sabratek stock was selling for approximately $22 per share, and the 1,565,565 shares of Sabratek stock plaintiffs received for their company were worth, on paper, more than $36,000,000.

5.       Shortly after the sale, the truth about Sabratek's financial condition and the real value of its stock emerged.

(a)       Hardly a month after the SRS Transaction closed, Sabratek—while falsely stating that there was "no need to revise its previously stated earnings"—announced that its second-quarter earnings would be "significantly" below Wall Street estimates. This announcement, on August 2, 1999, precipitated a sharp 30% one-day decline in Sabratek's share price to $14.56.

(b)       On August 13, 1999, Sabratek announced a delay in the release of its second-quarter earnings, "pending completion of a review with its independent auditors," precipitating a further one-day decline of more than 36% to $6.97.

(c)       On August 23, 1999, Sabratek announced the retention of consulting firm Jay Alix & Associates to develop a "restructuring plan" for the company and the resignation of

14107035.5

defendant Padda, Sabratek's Chief Executive Officer and Chairman of the Board. This announcement triggered a further 57% one-day decline in share price to $2.75.

6.     Finally, on October 7, 1999, Sabratek admitted that its audited financial statements for the two-year period immediately prior to the closing of the SRS Transaction, from April 1, 1997 to March 31, 1999, were materially misstated when issued requiring the restatement of approximately $39 million of expenses which improperly had been classified as assets. This resulted in a further one-day decline in share price of more than 52% to $1.03.

7.     This information regarding Sabratek's financial condition, which was either known or recklessly disregarded by defendants prior to and at the time of the SRS Transaction, was not conveyed to plaintiffs before they sold their business. To the contrary, defendants induced plaintiffs to sell SRS in exchange for Sabratek stock, rather than cash, by providing false assurances that plaintiffs could rely on Sabratek's reported financial statements and that Sabratek was in good financial condition.

8.     Since the SRS Transactions, Sabratek stock has been delisted from trading on the Nasdaq and reduced to the status of a penny stock and Sabratek has entered bankruptcy liquidation, resulting in the loss to plaintiffs of virtually all the consideration received for the sale of SRS.

II.

THE PARTIES

9.     Plaintiffs Robert C. Gienko, Mark Pugh, Steve Fagerman, and Kenneth Janowski were stockholders of SRS prior to and at the time of its sale to Sabratek on June 29, 1999.

10.     Defendant K. Shan Padda ("Padda") was the Chief Executive Officer and Chairman of the Board of Sabratek prior to and at the time of the SRS Transaction.

11.     Defendant Stephen L. Holden ("Holden") was the President and Treasurer of Sabratek prior to and at the time of the SRS Transaction.

12.     Defendant Paul S. Jurewicz ("Jurewicz") was the Senior Vice President and Chief Financial Officer of Sabratek prior to the SRS Transaction during the negotiation of the sale.

13.     Defendant John Reilly ("Reilly") was the Chief Financial Officer of Sabratek at the time of the SRS Transaction.

14.     Defendant William D. Lautman ("Lautman") was a director of Sabratek and a member of the Board's Audit Committee, prior to and at the time of the SRS Transaction, as well as a managing director and a director of EGS Securities Corporation ("EGS") at all times relevant to Sabratek's purchase of SRS.

15.     Defendant EGS, an investment banking firm, acted as an advisor to Sabratek and certain of the defendants in connection with Sabratek's purchase of SRS.

16.     Defendant KPMG LLP ("KPMG"), through its office in Chicago, Illinois, served as Sabratek's auditor and principal accounting firm prior to and at all times relevant to the SRS Transaction.

                    *        *        *

17.     Each of the defendants, as set forth with particularity herein, engaged in the fraudulent scheme that caused and induced plaintiffs to sell SRS to Sabratek in exchange for Sabratek stock, rather than cash. In furtherance of this scheme, defendants, either knowingly or in reckless disregard of the truth, made materially false representations to plaintiffs, including misstatements about Sabratek's financial health, and failed to disclose to plaintiffs material information about Sabratek that would have been important to plaintiffs' decision to sell SRS, which if known by plaintiffs would have caused them not to enter into the SRS Transaction.

14107035.5                          - 4 -

III.

JURISDICTION AND VENUE

18.     Claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5].

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Jurisdiction over the state law claims is by pendent jurisdiction.

20.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Sabratek maintains its principal executive offices in this District and the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

21.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

IV.

STATEMENT OF FACTS

A.

Background

22.     At all relevant times, SRS was a financial consulting firm specializing in Medicare, Medicaid, Blue Cross, and other third-party reimbursement programs. The consulting services SRS provided to the healthcare community of hospitals, skilled nursing facilities and home health agencies included the preparation and review of annual Medicare and other third-

party payor cost reports as well as other third party consulting services. Prior to and at the time of the sale, plaintiffs through their efforts had grown and developed SRS into a highly successful and profitable company.

23. At all relevant times, Sabratek was a publicly traded company that developed, made, and marketed medical equipment and healthcare information systems designed to meet the needs of the alternate-site (i.e., non-hospital) healthcare market. Sabratek's major product lines included infusion pumps, pre-filled syringes, and related interactive information systems intended to allow patients to be treated and monitored at alternate-site facilities.

B.

### Defendants' Scheme to Defraud Plaintiffs

24. Defendants first approached Gienko and the other plaintiffs in the fall of 1998 regarding Sabratek's possible acquisition of SRS. The parties held discussions regarding the proposed transaction, which continued until the sale was completed on June 29, 1999.

25. Initially, plaintiffs sought to structure any acquisition so that the majority of the consideration would be in cash. Jurewicz and the other defendants insisted, however, that the consideration take the form of Sabratek's stock. Accordingly, Sabratek's financial condition and performance, which affected the value of Sabratek's stock, became a critical factor in plaintiff's decision to undertake the SRS Transaction.

26. Ultimately, the parties structured the SRS Transaction so that (a) plaintiffs would sell their ownership interest in SRS to Sabratek in exchange for 1,565,565 shares of Sabratek stock, and (b) plaintiffs would continue to work for SRS after the sale. The transaction thus contemplated a long-term working relationship between plaintiffs and Sabratek, and plaintiffs reasonably trusted in and relied upon defendants' representations regarding Sabratek's financial condition.

27.     As a publicly traded company, Sabratek's financial statements are a matter of public record. At defendants' urging, plaintiffs relied upon the public records of Sabratek's financial condition, including Sabratek's reported 1998 year-end and March 31, 1999 quarterly financial statements, in determining to sell their company to Sabratek in exchange for Sabratek stock.

28.     Throughout the negotiations that led to the SRS Transaction, defendants were aware that plaintiffs were relying upon Sabratek's publicly reported financial information, and defendants in furtherance of their scheme to defraud plaintiffs responded to plaintiffs' inquiries about Sabratek's financial condition and performance by assuring plaintiffs that they could and should rely upon Sabratek's publicly reported financial information.

(a)     On several occasions during negotiations for the sale, plaintiffs and plaintiffs' accountant requested to review Sabratek's internal financial data as a supplement to publicly reported records. Defendants EGS, Lautman, and Reilly refused to provide this data but, on or about May 11 and May 22, 1999, assured plaintiffs and their accountant that they did not need to review such financial data since plaintiffs could and should rely upon Sabratek's publicly reported financial information.

(b)     These assurances were fraudulent, however. As shown below in paragraphs 40 through 48, Sabratek's financial statements for the period prior to June 29, 1999, upon which plaintiffs relied, were materially false and misleading and significantly overstated Sabratek's earnings, inter alia, by reporting as assets approximately $39 million paid to four affiliated entities to support research and development activities, which defendants have admitted should have been booked as expenses in accordance with Generally Accepted Accounting Principles ("GAAP").

    (c)    Defendants Reilly and Lautman, as Chief Financial Officer and a director and member of the Board's Audit Committee, respectively, had reason to know and knew or recklessly disregarded Sabratek's true financial condition while advising plaintiffs to rely upon Sabratek's materially misleading publicly reported financial statements.

29.    Defendant KPMG acted as Sabratek's auditor and principal accountant at all times relevant to the SRS transaction and participated in the scheme to defraud plaintiffs, <u>inter alia</u>, through its certification of Sabratek's false and misleading financial statements and through the actions of Brendan Gilboy ("Gilboy"), the KPMG engagement partner responsible for the Sabratek account.

    (a)    On March 12, 1999, KPMG provided an "unqualified" opinion of Sabratek's year-end 1998 financial statements stating that these statements "present fairly, in all material aspects" Sabratek's financial condition and that these statements were prepared in conformity with GAAP. As shown below in paragraphs 40 through 48, however, KPMG had reason to know and knew or recklessly disregarded Sabratek's true financial condition when certifying Sabratek's financial statements and further knew or recklessly disregarded these financial statements' non-conformity with GAAP. In its role as auditor, KPMG intentionally or recklessly also failed to take steps that it could have and should have which would have prevented KPMG from providing an unqualified opinion of Sabratek's year-end 1998 financial statements. This unqualified opinion, on which plaintiffs justifiably relied, greatly enhanced the scheme to defraud plaintiffs and KPMG knowingly participated or acquiesced in the presentation by its audit client, Sabratek, of materially misleading financial statements to plaintiffs.

    (b)    In a June telephone conversation between Gilboy and plaintiff's accountant, Gilboy confirmed that KPMG had audited Sabratek's publicly reported financial

statements, including its year-end 1998 financial statements, which audits stated that Sabratek's results were fairly presented in accordance with GAAP. Gilboy, however, failed to disclose to plaintiffs the fraudulent nature of these financial statements, which he had reason to know and knew or recklessly disregarded at the time based on KPMG's position as Sabratek's auditor and primary accountant, his close relationship with Sabratek executives as KPMG's engagement partner, and his role as an accountant charged with knowledge of GAAP.

(c)     On information and belief, Gilboy was motivated to confirm KPMG's audit of Sabratek's reported financial results and omit material information regarding Sabratek's true financial condition in furtherance of defendants' scheme to defraud plaintiffs in order to keep Sabratek's business with KPMG.

30.     Defendants Lautman and EGS advised Sabratek and certain of defendants in connection with the SRS Transaction and participated in the scheme to defraud plaintiffs through the actions of Lautman, as a principal and director of EGS, who identified himself to plaintiffs and their accountant as a representative of EGS, and his supervision of another EGS employee, Paul Teitelbaum, in connection with the SRS Transaction.

(a)     On or about March 10, 1999, Lautman advised plaintiffs' accountant that he personally had reviewed Sabratek's reported financial records and that there were "no problems" with Sabratek. He repeated this advice regarding Sabratek's first-quarter 1999 financial results on or about May 24, 1999. As a director and member of the Board's Audit Committee, Lautman had reason to know and knew or recklessly disregarded Sabratek's true financial condition at the time he provided such advice.

(b)     On or about May 11, 1999, Lautman, in response to plaintiffs' accountant, stated that Sabratek would satisfy Wall Street's earnings estimates for the second quarter of 1999

and the remainder of the year. Lautman repeated his assurances that the second quarter looked "okay" on or about May 24, 1999. As a director and member of the Board's Audit Committee, Lautman had reason to know and knew or recklessly disregarded Sabratek's true financial condition at the time he provided such advice.

       (c)     On information and belief, Lautman and EGS, which owned 150,000 shares of Sabratek stock, were motivated to misstate and/or omit material information regarding Sabratek's true financial condition in furtherance of defendants' scheme to defraud plaintiffs in order to maximize their fees on the SRS Transaction and prop up the value of EGS' Sabratek holdings of approximately 150,000 shares of stock.

    31.    On or about May 24, 1999, Lautman and defendant Reilly further represented to plaintiffs' accountant that it was important to close the SRS Transaction before the end of the second quarter. Unbeknownst to plaintiffs at the time, defendants were motivated to defraud plaintiffs and to close the SRS Transaction before June 30, 1999, so that the acquisition of SRS, which was to be accomplished under the pooling-of-interests accounting method, could be used to further disguise Sabratek's true financial condition and to produce a more favorable statement of Sabratek's second-quarter financial reporting, including more favorable earnings performance, than would be the case in the absence of the SRS Transaction.

    32.    In mid-June 1999, plaintiffs asked defendants Holden, Padda, and Reilly about the merits of an amended class action complaint filed on or about June 7, 1999 in federal district court in Chicago, which alleged that Sabratek, its officers, and directors, and KPMG had made false and misleading statements and omissions in Sabratek's financial statements, which had misrepresented the true value of Sabratek's stock and misled Sabratek investors.

       (a)     Defendants responded that there was no merit to the lawsuit. Shortly after

the amended complaint was filed, defendant Reilly represented to plaintiffs' accountant that Sabratek was in good financial health; that he would not still be with Sabratek if there were anything wrong with the company; that he was personally reviewing all source documents for the class-action lawsuit; and there were "no problems." As Chief Financial Officer, Reilly had reason to know and knew or recklessly disregarded Sabratek's true financial condition while making these representations.

(b)     In a June 21, 1999 press release, Padda represented that the allegations in the class action lawsuit were "wholly without merit" and that Sabratek's "audited financial statements were prepared in accordance with generally accepted accounting principles and were audited by an international accounting firm." As Chief Executive Office and Chairman of the Board, Padda had reason to know and knew or recklessly disregarded Sabratek's true financial condition while making these representations.

33.     When plaintiffs asked defendants for assurances about Sabratek's financial condition in late June 1999, shortly before the closing of the SRS Transaction, defendants represented that the accounting firm Altschuler, Melvoin & Glasser LLP ("AMG") could vouch for the accuracy of Sabratek's books and records, in addition to the company's auditor and principal accounting firm KPMG.

(a)     On or about June 24, 1999, defendants Holden and Reilly represented to plaintiffs that AMG soon would confirm the accuracy and fair presentation of Sabratek's financial statements. At the closing of the SRS Transaction, defendant Holden told plaintiffs that AMG had completed its review, which confirmed the validity of Sabratek's financial statements.

(b)     On information and belief, defendants Reilly and Holden knew these

statements were false when made. To date, AMG has not issued any opinion confirming the accuracy and validity of Sabratek's financial statements.

34.     Defendants' misrepresentations continued even at the June 29, 1999 closing of the SRS Transaction. On that date, defendant Holden represented that Sabratek's publicly reported financial statements, upon which plaintiffs had relied, were fairly presented and that the statements accurately described Sabratek's financial condition.

35.     During the negotiations for the SRS Transaction, defendants also repeatedly represented that Sabratek's stock would increase to $40 per share after the closing of the SRS Transaction, without providing any meaningful cautionary statements identifying factors that would cause Sabratek's stock price to fail to reach this level and knowing full well that such predictions were false and without any basis in fact at the time the statements were made.

        (a)     On or about May 24, 1999, defendant Reilly represented that Sabratek was a very strong company, and that the combined value of Sabratek and SRS would send the stock to a market value between $40 and $80 per share.

        (b)     Similar representations were made in a conference call between plaintiffs, defendants, and their representatives involved in the SRS Transaction, which took place between June 15 and June 20, 1999. On this call, Padda represented that Sabratek's stock, then trading at approximately $20 and $22 per share, would soon trade at $40 per share. Defendants Holden, Lautman, and Reilly also participated on the call and did not object to, or attempt to correct, Padda's representation.

36.     Defendants' representations, discussed in paragraphs 22 to 35, were materially false and misleading.

37.     Defendants intended that plaintiffs would rely upon these representations in entering into the SRS Transaction.

38.     At the time of these misrepresentations in paragraphs 22 to 35, defendants either knew the information was materially misleading or acted in reckless disregard to the truth or falsity of these representations.

39.     Plaintiffs relied on these representations in entering into the SRS Transaction.

C.

Sabratek's Admission that Its
Financial Statements Were Fraudulent

40.     Sabratek's financial statements for the period on and before June 29, 1999, upon which plaintiffs relied in selling SRS to Sabratek, were materially false and misleading and significantly overstated Sabratek's earnings.

41.     According to GAAP, a company must report research and development outlays as expenses.  During the two-year period ending March 31, 1999, Sabratek improperly reported as assets more than $39 million paid to four affiliated entities in purported "licensing fees" and "loans" or to a lesser extent "marketing fees," despite the fact that this money actually was used to support research and development activities.

42.     Specifically, Sabratek paid: (a) a total of $17.8 million to Unitron Medical Communications, Inc., consisting of $8.1 million in loans, $7 million in licensing fee payments, and $2.7 million under a sales and marketing agreement; (b) a total of $9.4 million to GDS Technology, Inc., consisting of at least $6.5 million for exclusive product rights; (c) $10 million to Healthmagic, Inc. in licensing fee payments; and (d) $2.7 million to Collaborations in Healthcare, LLC, for draws under a credit facility.  This $39.9 million sum essentially equals the

approximately $39 million in accounting restatements that the company announced on October 7, 1999.

43.     On that date, Sabratek publicly disclosed that it was restating its previously reported financial results for the reporting periods between April 1, 1997 and March 31, 1999—upon which plaintiffs had relied at defendants' urging—relating "primarily to reclassifying intangible assets as expenses and accounting for amounts advanced to affiliated companies as expenses rather than as loans" that would reduce Sabratek's earnings for the two-year period by approximately $39,000,000.

44.     Under GAAP, the restatement of previously reported financial statements is a serious procedure permitted only in the case of material accounting errors that existed at the time the financial statements originally were prepared.  Thus, Sabratek's admission that it should have expensed virtually all of the total $39.9 million paid to the four affiliated entities during the two-year period ending March 31, 1999 (as shown in detail above) shows that defendants knowingly or recklessly recorded this enormous amount of funds as assets rather than expenses in violation of GAAP as part of a scheme to inflate Sabratek's reported income and earnings per share.  As shown herein, Defendants used their fraudulent financial statements, including their year-end 1998 financial statements, to defraud plaintiffs through the SRS Transaction.

45.     None of the information in paragraphs 40 through 44 above, which was either known or recklessly disregarded by defendants at the time of the SRS Transaction, was conveyed to plaintiffs before they sold their business to Sabratek.

46.     Defendants had a duty to disclose this information to plaintiffs.

47.     This information was directly contrary to the assurances that defendants had made to plaintiffs to induce them to sell their company for Sabratek stock.

48.     This information, if known by plaintiffs, would have caused plaintiffs not to enter into the SRS Transaction.

D.

Additional Scienter Allegations

49.     As alleged herein, defendants acted with scienter because they knew and/or recklessly disregarded the falsity and misleading nature of the public documents and statements upon which plaintiffs relied—at defendants' urging and to the exclusion of other sources of information—in determining to enter into the SRS transaction.  Defendants substantially participated or acquiesced in the issuance of such documents and statements and participated in the fraudulent scheme against plaintiffs by virtue of their receipt of information reflecting the true facts regarding Sabratek, their control over and/or receipt and/or modification of Sabratek's materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Sabratek.  As alleged herein, defendants were motivated to defraud plaintiffs by the desire to employ Sabratek's overinflated stock, rather than cash, as consideration for the SRS sale and to use SRS' strong financial condition via the acquisition to further disguise Sabratek's weakened financial state.

E.

Defendants' Fraud Resulted in
Millions of Dollars of Losses to Plaintiffs

50.     At the time of the SRS Transaction, SRS was worth more than $23,000,000.

51.     At the time of the SRS Transaction, Sabratek stock was selling for approximately $22 per share.

52.     The shares of Sabratek stock plaintiffs received for their company were worth over $36,400,000 at the time of the SRS Transaction.

14107035.5

53.     Plaintiffs could not sell those shares until Sabratek registered them.  This

registration never occurred.

54.     The Sabratek stock has since plummeted to less than only pennies per share—in

the range of 3 cents per share at the time of the preparation and filing of this complaint—

resulting in the loss to plaintiffs of virtually all the consideration received for the sale of their

business.

F.

Plaintiffs' Subsequent
Agreement with Sabratek

55.     On or about October 21, 1999, in order to mitigate the damages caused by

defendants' fraud, plaintiffs purchased from Sabratek certain assets of SRS and assumed certain

of SRS's liabilities.

56.     At the time plaintiffs repurchased the SRS assets from Sabratek, the value of the

SRS assets was substantially lower than at the time of the SRS Transaction.

57.     Plaintiffs have suffered, inter alia, losses equal to (a) the difference in the value of

their SRS stock at the time of the SRS Transaction and the value of the SRS assets, less assumed

liabilities, they purchased on October 21, 1999, plus (b) the consideration plaintiffs provided to

repurchase the SRS assets.

V.

CLAIMS FOR RELIEF

COUNT I:
VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT
AND RULE 10b-5 PROMULGATED THEREUNDER
(Applicable to all Defendants)

58.     Plaintiffs incorporate herein the allegations of paragraphs 1 through 57.

14107035.5

59.      Defendants' representations identified above were false statements and/or omissions of material fact.

60.      Defendants knew or believed these representations to be false.

61.      Plaintiffs justifiably relied on the truth of these representations in entering into the SRS Transaction.

62.      Defendants' conduct violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

63.      As a direct and proximate result of defendants' wrongful conduct, plaintiffs have suffered damages.

**COUNT II:**
**VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT**
(Applicable to all Defendants, except EGS and KPMG)

64.      Plaintiffs incorporate herein the allegations of paragraphs 1 through 63.

65.      Defendants, except EGS and KPMG, acted as controlling persons of Sabratek within the meaning of Section 20(a) of the Exchange Act.

66.      Defendants had direct and supervisory involvement in the day-to-day operations of Sabratek and, therefore, are presumed to have had the power to control or influence the events that led up to the SRS Transaction.

67.      As set forth above, defendants' misrepresentations violated Section 10(b) and Rule 10b-5.  By virtue of their positions as controlling persons, defendants are liable pursuant to Section 20(a) of the Exchange Act.

68.      As a direct and proximate result of defendants' wrongful conduct, plaintiffs have suffered damages.

COUNT III:
COMMON LAW FRAUD
(Applicable to all Defendants)

69.     Plaintiffs incorporate herein the allegations of paragraphs 1 through 68.

70.     Defendants' representations identified above were false statements of material fact.

71.     Defendants' representations identified above were false statements of material fact.

72.     Defendants knew or believed these representations to be false.

73.     Defendants intended to induce plaintiffs to enter into the SRS Transaction by making these representations.

74.     Plaintiffs justifiably relied on the truth of these representations.

75.     Plaintiffs have been damaged as a result of such reliance.

76.     Defendants also concealed material facts, and intended to induce a false belief among plaintiffs, under circumstances creating a duty to speak.

77.     Plaintiffs could not have discovered the truth through a reasonable inquiry or inspection, were prevented from making a reasonable inquiry or inspection, and relied upon the silence as a representation that the fact did not exist.

78.     The concealed information was such that plaintiffs would have acted differently had they been aware of it.

79.     Defendants' misconduct is outrageous and their acts were performed with malice, evil motive, or reckless indifference towards the rights of others and were willful and wanton.

14107035.5

COUNT IV:
VIOLATION OF THE ILLINOIS SECURITIES LAW OF 1953
(Applicable to all Defendants)

80. Plaintiffs incorporate herein the allegations of paragraphs 1 through 79.

81. Plaintiffs acquired the shares of Sabratek for value.

82. The sale of shares occurred in Illinois.

83. Defendants were either controlling persons at Sabratek or participated or aided in making the sale of securities to plaintiffs, or both.

84. Defendants' conduct violated the Illinois Securities Law of 1953, 815 ILCS § 5/1 et seq., including but not limited to the following provisions:

(a) 815 ILCS § 5/12(F): "To engage in any transaction, practice or course of business in connection with the sale or purchase of securities which works or tends to work a fraud or deceit upon the purchaser or seller thereof."

(b) 815 ILCS § 5/12(G): "To obtain money or property through the sale of securities by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."

(c) 815 ILCS § 5/12(I): "To employ any device, scheme or artifice to defraud in connection with the sale or purchase of any security, directly or indirectly."

85. Defendants' violation of the Illinois Securities Law of 1953, 815 ILCS § 5/1 et seq. caused damages to plaintiffs.

86. Plaintiffs have notified defendants of their written election of rescission by sending written notice within six months after gaining knowledge that the SRS sale was voidable.

## COUNT V:
## VIOLATION OF THE ILLINOIS CONSUMER FRAUD ACT
### (Applicable to all Defendants)

87.    Plaintiffs incorporate herein the allegations of paragraphs 1 through 86.

88.    Defendants' conduct violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2 (the "Consumer Fraud Act").

89.    Defendants' misrepresentations and omissions were material and constituted a deceptive act or practice within the meaning of the Consumer Fraud Act.

90.    Defendants intended that plaintiffs would rely on the deception.

91.    Plaintiffs did in fact justifiably rely on defendants' deception.

92.    The deception occurred in the course of conduct involving trade or commerce, namely the sale of SRS for shares of Sabratek.

93.    Defendants' misconduct was outrageous and their acts were performed with malice, evil motive, or reckless indifference towards the rights of others and were willful and wanton.

WHEREFORE, plaintiffs Robert C. Gienko, Mark Pugh, Steve Fagerman, and Kenneth Janowski pray that the Court enter judgment in their favor and against defendants:

    1.    For compensatory damages plus prejudgment interest;

    2.    For punitive damages;

    3.    For attorneys' fees and costs;

    3.    For plaintiffs' costs of suit; and

    4.    For such other and further relief as this Court deems just and proper.

## VI.

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED:  August 18, 2000

Respectfully submitted,

SONNENSCHEIN NATH & ROSENTHAL

By: _____

Attorneys for plaintiffs
ROBERT C. GIENKO, MARK PUGH,
STEVE FAGERMAN, and KENNETH
JANOWSKI

Alan S. Gilbert (ARDC No. 953210)
John C. Koski (ARDC No. 6211034)
Thomas A. Andreoli (ARDC No. 6242429)
SONNENSCHEIN NATH & ROSENTHAL
8000 Sears Tower
233 South Wacker Drive
Chicago, IL  60606
(312) 876-8000
(312) 876-7934 (fax)

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as require
by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use
of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
Robert C. Gienko, Mark Pugh, Steve Fagerman,
and Kenneth Janowski

## DEFENDANTS
K. Shan Padda, Steven L. Holden,
Paul S. Jurewicz, John Reilly,
William D. Lautman, EGS Securities
Corporation, and KPMG LLP

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Alan S. Gilbert, John C. Koski, Thomas A. Andreoli
Sonnenschein Nath & Rosenthal, 8000 Sears Tower
233 S. Wacker Drive, Chicago, IL 60606
312-876-8000

ATTORNEYS (IF KNOWN) JUDGE COAR

00C 5070

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government
Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government
Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties
in Item III)

MAGISTRATE JUDGE BOBRICK

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTI
(For Diversity Cases Only)
AND ONE BOX FOR DEFENDANT)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
another district
(specify)

☐ 6 Multidistrict
Litigation

☐ 7 Appeal to District
Judge from
Magistrate
Judgment

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury — Med. Malpractice | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury — Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 340 Marine | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 830 Patent | ☐ 810 Selective Service |
| | ☐ 345 Marine Product Liability | ☐ 371 Truth in Lending | ☐ 690 Other | ☐ 840 Trademark | ☒ 850 Securities/Commodities/Exchange |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | | | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| | | | | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 950 Constitutionality of State Statutes |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 890 Other Statutory Actions |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS — Third Party 26 USC 7609 | |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE.
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

Claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. Sections
78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder [17 C.F.R. Section 240.10b-5]. This is an action for
damages based on defendants' securities fraud.

## VII. REQUESTED IN COMPLAINT

CHECK IF THIS IS A CLASS ACTION
☐ UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint
JURY DEMAND: ☒ YES ☐ NO

DOCKETED

## VIII. This case
☒ is not a refiling of a previously dismissed action.
☐ is a refiling of case number _____, previously dismissed by Judge _____

AUG 2 1 2000

DATE 9/18/00

SIGNATURE OF ATTORNEY OF RECORD

UNITED STATES DISTRICT COURT

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

**In the Matter of**

Gienko, Pugh, Fagerman, and Janowski

v.

Padda, Holden, Jurewicz, Reilly, Lautman,
EGS Securities Corporation, and KPMG LLP

Case Number: 00C 5070

**APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:**

Gienko, Pugh, Fagerman, and Janowski

JUDGE COAR

MAGISTRATE JUDGE BOBRICK

| (A) | (B) |
|---|---|
| SIGNATURE *Alan S. Gilbert* | SIGNATURE *John C. Koski* |
| NAME Alan S. Gilbert | NAME John C. Koski |
| FIRM Sonnenschein Nath & Rosenthal | FIRM Sonnenschein Nath & Rosenthal |
| STREET ADDRESS 8000 Sears Tower, 233 S. Wacker Drive | STREET ADDRESS 8000 Sears Tower, 233 S. Wacker Drive |
| CITY/STATE/ZIP Chicago, IL 60606 | CITY/STATE/ZIP Chicago, IL 60606 |
| TELEPHONE NUMBER 312-876-7410 | TELEPHONE NUMBER 312-876-3161 |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 953210 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6211034 |
| MEMBER OF TRIAL BAR? YES [X] NO [ ] | MEMBER OF TRIAL BAR? YES [X] NO [ ] |
| TRIAL ATTORNEY? YES [X] NO [ ] | TRIAL ATTORNEY? YES [X] NO [ ] |
|  | DESIGNATED AS LOCAL COUNSEL? YES [ ] NO [X] |

| (C) | (D) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME Thomas A. Andreoli | NAME |
| FIRM Sonnenschein Nath & Rosenthal | FIRM |
| STREET ADDRESS 8000 Sears Tower, 233 S. Wacker Drive | STREET ADDRESS |
| CITY/STATE/ZIP Chicago, IL 60606 | CITY/STATE/ZIP |
| TELEPHONE NUMBER 312-876-7474 | TELEPHONE NUMBER |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6242429 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR? YES [ ] NO [X] | MEMBER OF TRIAL BAR? YES [ ] NO [ ] |
| TRIAL ATTORNEY? YES [ ] NO [X] | TRIAL ATTORNEY? YES [ ] NO [ ] |
| DESIGNATED AS LOCAL COUNSEL? YES [ ] NO [X] | DESIGNATED AS LOCAL COUNSEL? YES [ ] NO [ ] |

DOCKETED
AUG 2 1 2000

**PLEASE COMPLETE IN ACCORDANCE WITH INSTRUCTIONS ON REVERSE.**